# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| EXIT STRATEGY, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0017-NAC |
| | ) | |
| FESTIVAL RETAIL FUND BH, L.P., | ) | |
| FRFBH, LLC, and MARK SCHURGIN, | ) | |
| | ) | |
| Defendants. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Date Submitted: April 17, 2023
Date Decided: July 17, 2023

David A. Jenkins, Laurence V. Cronin, Jason Z. Miller, SMITH KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; *Counsel for Plaintiff Exit Strategy, LLC*.

Douglas D. Herrmann, James H. S. Levine, TROUTMAN PEPPER HAMILTON SANDERS LLP, Wilmington, Delaware; Andrew W. Zepeda, LURIE, ZEPEDA, SCHMALZ, HOGAN & MARTIN, Los Angeles, California; *Counsel for Defendants Festival Retail Fund BH, L.P., FRFBH, LLC, and Mark Schurgin*.


**COOK, V.C.**

The plaintiff sold to a limited partnership its option to buy a luxury retail store. In exchange, the plaintiff received a contingent value right to a partial distribution of the proceeds from a future sale of the property. The distribution depended on receipt of a threshold amount of net return. In calculating net return, the general partner had broad discretion to deduct costs incurred by the partnership in the sale. The general partner owed no fiduciary duties to the plaintiff and its deductions were governed only by a subjective bad faith standard.

After the partnership sold the property, the general partner deducted several costs from the proceeds, including the costs of removing a mortgage. Removing the mortgage was a condition to closing the sale. The deductions resulted in a net return lower than the applicable threshold. So the plaintiff did not receive a distribution.

At trial, the plaintiff sought to prove that the general partner improperly deducted three types of costs, including the mortgage removal costs. The plaintiff also sought to hold the general partner's controller liable for the deductions.

The parties spent most of trial discussing extrinsic evidence. But they now agree that their limited partnership agreement is unambiguous. Under its plain language, the general partner was permitted to deduct the mortgage removal costs. That deduction alone precludes the plaintiff's distribution. And because that deduction was proper, the claim against the general partner's controller fails. Judgment is therefore entered in favor of the defendants.

# I.    FACTUAL BACKGROUND

The evidence presented at trial supports the following findings of fact.[1]

## A.    The Parties Form The Partnership.

Plaintiff Exit Strategy, LLC invests in commercial real estate. In 2005, Exit purchased for $3 million an option to buy the Gucci flagship store located on Rodeo Drive in Beverly Hills, California (the "Property"). Exit lacked the capital to exercise the option. So Exit sold it to an asset management group ("Festival").

The parties structured the transaction as a partnership. Each side retained sophisticated counsel to draft the terms.[2] During negotiations, one of Exit's owners, Steven Emanuel,[3] proposed terms that he "invented."[4] Counsel rejected almost all of them.[5] The operative terms are memorialized in a limited partnership agreement (the "LPA").

---

[1] Although the record appears voluminous, the parties' post-trial arguments helpfully narrowed the issues. So I limit my findings to the facts relevant to my decision. That said, I have considered all the evidence and cite to specific documents where appropriate. Citations in the form of "Tr. — ([Witness])" refer to the transcript of the trial testimony. Citations in the form of "JX — ([Descriptor])" refer to the exhibits introduced at trial. Citations in the form of "PTO —" refer to the parties' pre-trial stipulations of fact. Citations in the form of "Oral Arg. Tr. —" refer to the post-trial oral argument transcript.

[2] *See, e.g.*, Tr. at 26, 195, 398 (Various Witnesses).

[3] Emanuel is better known as the creator of the "*Emanuel CrunchTime*" law school study aid series. *See id.* at 7:22–8:7, 262–64 (Emanuel).

[4] *See, e.g.*, *id.* at 110:8–21 (Emanuel).

[5] Defendants introduced a redline comparison at trial. *See* Ex. A to Dkt. 141.

The LPA established a Delaware limited partnership, Defendant Festival Retail Fund BH, L.P. (the "Partnership"). Defendant FRFBH, LLC served as the Partnership's "General Partner."[6] Defendant Mark Schurgin served as the General Partner's President. Through that role, Schurgin controlled the General Partner.

With this structure in place, the Partnership acquired the option from Exit. In exchange, Exit (i) received approximately $11 million in cash; and (ii) became the "Special Limited Partner" of the Partnership. The Special Limited Partner has no power within the Partnership. It is instead a title coined under the LPA to reflect Exit's receipt of what amounts to a contingent value right. The LPA governs that right, as well as the roles of the General Partner and the Special Limited Partner.

### 1. The Role Of The General Partner

The General Partner has "exclusive" authority to manage the Partnership.[7] That authority encompasses "the power to do any and all acts necessary, convenient or incidental to or for the furtherance of" or "in connection with" the Partnership's "purposes."[8] The Partnership's purposes are:

> (i) to acquire, own, renovate, finance, refinance, lease, operate, manage, sell or otherwise dispose of [the Property]; and

---

[6] JX 39 at A-2 (cited as "LPA"). The General Partner is a Delaware limited liability company. PTO ¶ 3.

[7] LPA § 9(a).

[8] *Id.* §§ 7(b), 9(b). *See id.* § 8.

3

(ii) to engage in any lawful act or activity and to exercise any powers . . . related or incidental to and necessary, convenient or advisable for the accomplishment of the above-mentioned purposes.[9]

The General Partner thus may cause the Partnership to "enter into and perform . . . any [] agreement or arrangement . . . in the sole judgment of the General Partner," that is related or incidental to, or for the furtherance of, or in connection with, the Partnership's purposes of acquiring, owning, and selling the Property.[10]

> The General Partner owes no fiduciary duties to the Special Limited Partner.

> To the fullest extent permitted by law, including . . . Section 17-1101(d) of the [Delaware Revised Uniform Limited Partnership] Act . . . [t]he Special Limited Partner hereby waives any and all fiduciary obligations owed by the General Partner to the Special Limited Partner . . . .[11]

The General Partner is exculpated for breaching the LPA unless it fails to act in "good faith on behalf of the Partnership[.]"

> To the fullest extent permitted by applicable law, neither the General Partner . . . nor any employee, representative, manager, [or] agent . . . of the General Partner . . . shall be liable . . . by reason of any act or omission performed or omitted . . . in good faith on behalf of the Partnership and in a manner reasonably believed to be within the scope of the authority conferred . . . by [the LPA.][12]

---

[9] *Id.* § 7(a).

[10] *Id.* § 7(b).

[11] *Id.* § 10.

[12] *Id.* § 18(a). This provision maintains liability for "damage" only if the General Partner engages in "gross negligence" or "willful misconduct." *Id.*

4

## 2. The Role of the Special Limited Partner

In contrast to the General Partner, the Special Limited Partner has no "part or role in the operation or management of the Partnership[.]"[13]  It has no voting or liquidation rights either.[14]  The Special Limited Partner instead holds a minority interest in the Partnership that operates as a contingent value right to receive a partial distribution of the proceeds from a future sale of the Property (the "Special Limited Partner's Portion").[15]  The LPA specifies the "limited circumstances" under which Exit receives the Special Limited Partner's Portion.[16]  Those limited circumstances are reflected in a formula.

## 3. The Special Limited Partner's Portion

The LPA defines the Special Limited Partner's Portion mathematically as:

> with respect to a Resale, the amount equal to (i) the Base Resale Distribution Amount . . . for the applicable Resale Year plus (ii) an amount equal to 10% of the amount by which the Net Resale Price exceeds the Resale Price Threshold for such Resale Year.[17]

Based on this formula, Exit receives "100%" of the "Resale Proceeds . . . until the cumulative amount distributed equals the Special Limited Partner's Portion[.]"[18]

---

[13] *Id.* § 9(b).

[14] *Id.* §§ 10, 23.

[15] PTO ¶ 12.  *See also* LPA § 15(b).

[16] LPA § 10.

[17] *Id.* at A-6.

[18] *Id.* § 15(b).

The Special Limited Partner's Portion thus is tied to a glossary of interrelated definitions: "Resale," "Base Resale Distribution Amount," "Resale Price Threshold," "Resale Year," "Net Resale Price," and "Resale Proceeds." These terms intersect with the General Partner's broad discretion to manage the Partnership.

### a. "Resale"

The LPA defines a Resale as:

> a *bona fide* arm's-length-sale . . . by the Partnership at any time of all of its interest in the Property to an unaffiliated third party; <u>provided,</u> however, . . . that the Base Resale Distribution Amount and the Resale Price Threshold . . . shall be prorated . . . *(as determined by the General Partner in its good faith discretion)* by the same proportion that the portion of the Property sold under the Resale bears to the Property.[19]

### b. "Base Resale Distribution Amount"; "Resale Price Threshold"; "Resale Year"

The Base Resale Distribution Amount and the Resale Price Threshold are defined using fixed figures that vary by Resale Year:[20]

---

[19] *Id.* at A-5 (underlining in original) (emphasis added).

[20] *See id.* at Schedule D. The "Resale Year" is the "calendar year in which any Resale occurs." *Id.* at A-5.

| Resale Year | Resale Price Threshold | Base Resale Distribution Amount* |
|---|---|---|
| 2007 | $50 million | $1.5 million |
| 2008 | $50 million | $1.5 million |
| 2009 | $55 million | $2.0 million |
| 2010 | $62 million | $2.0 million |
| 2011 | $72 million | $2.5 million |
| 2012 | $80 million | $3.0 million |
| 2013 | $90 million | $3.0 million |
| 2014 | $100 million | $3.0 million |
| 2015 | $115 million | $3.0 million |
| 2016 | $130 million | $3.0 million |
| 2017 | $150 million | $3.0 million |
| Post-2017 years | $150 million + 15% Compounded Annual Growth Rate after 2017 | $3.0 million |

The Resale Price Threshold is a potential bar to Exit's receipt of the Special Limited Partner's Portion:

> If for any Resale, the Net Resale Price is less than the Resale Price Threshold for the applicable Resale Year, the Base Resale Distribution Amount shall be reduced by one dollar for each dollar by which the Resale Price Threshold exceeds the Net Resale Price until the Base Resale Distribution Amount has been reduced to zero.[21]

If the applicable Resale Price Threshold exceeds the "Net Resale Price" by $3 million or more,[22] then Exit does not receive the Special Limited Partner's Portion.

### c.    "Net Resale Price"

The LPA defines Net Resale Price as "the gross price derived from [a] Resale, as shown in the Resale Contract," minus deductions for "one or all" of eight

---

[21] *Id.* at Schedule D & note.

[22] The parties agree that either the 2013 or 2014 Resale Price Threshold applies. Both Resale Years specify $3 million as the Base Resale Distribution Amount. *Id.*

7

categories of costs incurred by the Partnership in a Resale.[23]  The parties have focused on three of those categories: Subsections (d), (f), and (h).[24]

Subsection (d) permits deductions for "costs or expenses associated with the ownership . . . of the Property reasonably borne by . . . the Partnership during the Partnership's ownership[.]"[25]

Subsection (f)[26] permits deductions for "excess costs associated with any loan on the Property . . . during the Partnership's ownership."  These "Excess Loan Costs" include "loan interest costs . . . negative accruals and similar costs[.]"  In relevant part, Excess Loan Costs are deductible if "the amount by which aggregate loan interest costs in any year . . . exceed Rental Payments," defined as a threshold amount of payments from the Property's tenant.  The Rental Payment threshold is fixed at a notional amount of "$875,000.00 (subject to proration for any partial year[.])"

Subsection (h) permits deductions for:

> [a]ll . . . out-of-pocket closing costs and costs of sale incurred in connection with [a] Resale, including without limitation . . . out-of-pocket survey and title costs, documentary transfer taxes, recording fees, escrow charges and reasonable attorneys' fees and costs.[27]

---

[23] *Id.* at A-3 to A-4.  "Resale Contract" is defined as the purchase agreement.  *Id.* at A-5.

[24] The parties also have focused on Subsection (g), which permits deductions for equity-based "fees."  *Id.* at A-4.  Subsection (g) implicates one of the deductions in this case.  *See infra* Part I. Section D.  I do not reach that deduction, so I do not discuss Subsection (g).

[25] LPA at A-3.

[26] *Id.* at A-3 to A-4.

[27] *Id.* at A-4.

8

### d. "Resale Proceeds"

The LPA defines Resale Proceeds as "any proceeds received by the Partnership upon a Resale less the portion thereof used to pay all Partnership expenses [or] indebtedness . . . *all as determined by the General Partner*."[28] The LPA elsewhere specifies that the General Partner has "sole discretion" to allocate all "income, gain, loss, deduction or credit" in accordance with the partners' "economic interests in the Partnership[.]"[29]

Read together, the Special Limited Partner's Portion is not distributable at or above the Base Resale Distribution Amount unless there is (i) a Resale that generates (ii) Resale Proceeds equating, after the General Partner's deductions, to a (iii) Net Resale Price above or not $3 million or more below (iv) the Resale Price Threshold for (v) the applicable Resale Year.

## B. The Partnership Secures The CMBS Loan On The Property.

In 2007, the Partnership exercised the option and acquired the Property for $39 million. In financing the call price, the Partnership secured a mortgage on the Property (the "CMBS Loan"). The Partnership obtained the CMBS Loan under a loan agreement with Column Financial, Inc. (the "Loan Agreement").[30] Before it

---

[28] *Id.* at A-5 (emphasis added).

[29] *Id.* § 14.

[30] JX 41 (cited as "Loan Agreement").

sold the option to the Partnership, Exit itself considered obtaining the CMBS Loan from Column Financial.[31]

The Loan Agreement addresses "defeasance."[32] Defeasance is the process by which a borrower replaces collateral with a portfolio of securities, *e.g.*, low-risk bonds, that yields a rate of return sufficient to economically replicate the interest due to the lender.[33] Defeasance thus strips a security interest off the asset, allowing the borrower to sell it unencumbered, while maintaining the lender's right to repayment. Without defeasance, the borrower would be forced to service the debt using cashflow generated by the sale, reducing return, or face default or contractual penalties.[34] Defeasance costs vary with the lender's interest rate and market conditions, but usually amount to a premium.[35] The Loan Agreement required the Partnership to defease the CMBS Loan at its own "expense[]" if the Partnership sold the Property before November 2016.[36]

The LPA incorporates these terms. The LPA provides that the General Partner may cause the Partnership to execute the "Basic Documents."[37] The Basic

---

[31] Tr. at 172–73 (Emanuel).

[32] Loan Agreement § 2.5.

[33] *See* Tr. at 547–51 (Defs.' Expert).

[34] *See id.* (Defs.' Expert).

[35] *See id.* at 550 (Defs.' Expert).

[36] Loan Agreement § 2.5.1.

[37] LPA § 7(b).

Documents include the "Loan Documents."[38]  The Loan Documents include the

Loan Agreement.[39]  The LPA prohibits the Partnership from amending the LPA's

definitions—including the terms governing the Special Limited Partner's Portion—

without Column Financial's approval.[40]

## C.    The Partnership Sells The Property.

The Partnership collected rent from the Property's tenant.  The rent varied by

year, but never exceeded the $875,000 figure identified in Subsection (f).[41]  Still, the

Property's overall value increased.  So the Partnership resolved to sell it.

On September 26, 2013, the Partnership agreed in principle to sell the Property

for $108 million to Ponte Gadea California, LLC (the "Ponte Gadea Sale").  The

Ponte Gadea Sale is memorialized in a purchase agreement (the "PGSA").[42]  The

PGSA set a closing date of December 10, 2013.[43]  The Partnership, however, could

extend that date by thirty days.[44]  Either way, the PGSA required the Partnership "to

---

[38] *Id.* at A-1.

[39] *Id.* at A-2.

[40] *Id.* § 9(c)(ii); *see id* at A-2 (defining "Lender" as Column Financial).

[41] JX 117 (Summary Accounting Statement).

[42] JX 74 (cited as "PGSA").

[43] *Id.* § 18.

[44] *Id.*

remove, by payment, bonding or otherwise any . . . mortgages that secure indebtedness against" the Property before closing the Ponte Gadea Sale.[45]

In October 2013, Ponte Gadea placed a $6 million deposit on the Property.[46] At the time, the Partnership had been searching for a "1031 Exchange" property. A 1031 Exchange is shorthand for a federal tax procedure allowing a property seller to roll sale proceeds into a substitute property to defer capital gains tax on the sale.[47]

Given holidays and related practical constraints, a December 2013 closing would not have allowed the Partnership enough time to complete a 1031 Exchange. So the Partnership invoked its extension right. The Ponte Gadea Sale ultimately closed on January 7, 2014. Before closing, the Partnership defeased the CMBS Loan at a premium to the CMBS Loan's interest costs.[48]

**D.     The General Partner Takes The Challenged Deductions.**

In calculating the Resale Proceeds from the Ponte Gadea Sale, the General Partner deducted $18,077,752 in costs from the purchase price.[49] The deductions resulted in a Net Resale Price of $89,922,248. Of the total deductions: (i) $6,250,155 represents the costs of defeasing the CMBS Loan (the "Defeasance Deduction"); (ii)

---

[45] *Id.* § 6(c). *See also* Ex. 3 to *id.*

[46] *See, e.g.*, JX 77 (e-mail from Schurgin to the Partnership's banker).

[47] *See generally* 26 U.S.C. § 1031(a)(3).

[48] *See* JX 86 (Defeasance Report).

[49] JX 117 (Summary Accounting).

$4,556,486 represents "negative accruals" costs (the "Negative Accruals Deduction");[50] and (iii) $1,266,532 represents "preferred return on equity" costs (the "Preferred Return Deduction" and together with the Defeasance Deduction and Negative Accruals Deduction, the "Challenged Deductions").[51]

In taking the deductions, the General Partner relied on the LPA's definition of Net Resale Price and reviewed the Partnership's books and records, including the Loan Agreement and the PGSA.[52] The General Partner's process followed the accounting procedures that Festival always had used for distributions. Based on this information and its experience, the General Partner took the Defeasance Deduction because, among other things, defeasance was required to close the Ponte Gadea Sale and to avoid a breach of the Loan Agreement.[53]

The 2014 Resale Price Threshold exceeded the Net Resale Price by more than $3 million. So Exit did not receive the Special Limited Partner's Portion.

---

[50] Negative accruals comprise a type of Excess Loan Costs. LPA at A-3. It is one of the terms Emanuel "invented." Tr. at 110:8–21 (Emanuel). Evidence at trial established that "negative accruals" has no meaning in the commercial real estate industry and that Emanuel did not communicate his definition to Exit's deal counsel. Exit's deal counsel could not even remember why the parties included the term in Subsection (f). Tr. at 202. For the reasons below, the history surrounding negative accruals and the Negative Accruals Deduction is not relevant to my analysis.

[51] Exit does not contest the remaining $6,004,579 in deductions.

[52] *See, e.g.*, Tr. at 479–97 (Festival Accountant) (describing deduction process).

[53] *See, e.g.*, *id.* at 491–96, 509:12–15 (Festival Accountant).

## E.     Exit Sues.

Exit brought this action to invalidate the Challenged Deductions.  At trial, Exit sought to prove that the Partnership and the General Partner breached the LPA by taking the Challenged Deductions.[54]  Exit also sought to prove that Schurgin directed the Challenged Deductions in "bad faith."  Defendants raised various defenses to Exit's claims, including that the Defeasance Deduction was proper under the LPA.[55]

The parties submitted post-trial briefing and presented oral argument.  Their efforts narrowed the record to the LPA's plain language and the principles governing Delaware limited partnerships.  My analysis turns on those sources of authority.

## II.     LEGAL ANALYSIS

Exit bore the burden to prove its claims by a preponderance of the evidence.[56]  As explained below, Exit failed to meet that burden.  The LPA exculpates the

---

[54] Exit also brought a declaratory claim.  "The Delaware Declaratory Judgment Act does not create substantive rights of any sort; it merely offers a procedural means for securing judicial relief . . . ."  *250 Exec., LLC v. Christina Sch. Dist.*, 2022 WL 588078, at *4 (Del. Ch. Feb. 28, 2022) (internal quotation marks omitted).  So the Court must focus on the substance of the allegations to determine what type of "rights" or "status" the claimant seeks declared.  10 *Del. C.* § 6501.  Here, Exit sought a declaration as to contractual rights or status.  Dkt. 12 ¶¶ 76–78.  My analysis of the breach of contract claims therefore subsumes the declaratory claim.

[55] Defendants' other defenses included laches and a contractual defense based on a purported Resale involving the Partnership's sole limited partner.  Because I find that Exit's claims fail under its own theory of the case, I assume, without deciding, that its claims are timely and need not reach Defendants' alternative contractual defenses.

[56] *See, e.g.*, *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 841, 859 (Del. Ch. 2022) (breach of fiduciary duty); *Zimmerman v. Crothall*, 62 A.3d 676, 691 (Del. Ch. 2013) (breach of contract).

14

General Partner for breaches of the LPA unless the General Partner acts in subjective bad faith. Exit overlooked that standard. Even so, Defendants are not liable under Exit's presentation of the case, because the Defeasance Deduction fits within the LPA's plain language. Based on the applicable Resale Price Threshold, the Defeasance Deduction alone precludes Exit from receiving the Special Limited Partner's Portion. Exit's breach of contract claims therefore fail. The claim against Schurgin consequently fails because the General Partner complied with the LPA. Accordingly, judgment is entered in Defendants' favor.

## A.    Exit Failed To Prove Its Breach Of Contract Claims.

Exit's contract claims are based on the LPA. Delaware law governs the LPA.[57] In Delaware, the goal of contract interpretation is to "effectuate the parties' intent."[58] "To determine what contractual parties intended, Delaware courts start with the text."[59] And if the text is unambiguous, Delaware courts end there too. "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[60]

---

[57] LPA § 28.

[58] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[59] *Sunline Com. Carriers, Inc. v. CITGO Petro. Corp.*, 206 A.3d 836, 846 (Del. 2019).

[60] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

Even the most "steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[61]  Instead, "a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[62]  By contrast, a contract is unambiguous if "the plain, common, and ordinary meaning of [its] words lends itself to only one reasonable interpretation[.]"[63]  An unambiguous contract must be enforced "as written and not as hoped for by litigation-driven arguments."[64]

"The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arm[']s-length negotiations."[65]  "It is not the court's role to rewrite [a] contract between sophisticated market participants . . . to suit the court's sense of equity or fairness."[66]  Nor is it "the job of a court to relieve sophisticated parties of the burdens of contracts they wish they had drafted

---

[61] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

[62] *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[63] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 462 (Del. Ch. 2008).

[64] *Urdan v. WR Cap. P'rs, LLC*, 244 A.3d 668, 675 (Del. 2020).

[65] *W. Willow-Bay Ct., LLC v. Robino-Bay Ct. Plaza, LLC*, 2007 WL 3317551, at *9 (Del. Ch. Nov. 2, 2007), *aff'd*, 985 A.2d 391 (Del. 2009) (TABLE).

[66] *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 872 A.2d 611, 624 (Del. Ch. 2005), *aff'd in part, rev'd in part on other grounds*, 901 A.2d 106 (Del. 2006).

differently but in fact did not."[67]  "Even if the bargain they strike ends up a bad deal for one or both parties, the court's role is to enforce the agreement as written."[68]

These principles cannot be applied in a vacuum, because "the commercial context between the parties . . . give[s] sensible life to [their] contract."[69]  In the limited partnership context, courts assume the parties had optionality and nevertheless chose to form a limited partnership "with full knowledge of the significance of [its] operational framework[.]"[70]  Indeed, "the decision to adopt and operate under a [limited partnership] is [a] fundamental business decision that courts routinely protect."[71]  Based on this conceptual paradigm, courts afford "significant deference" to the terms of limited partnership agreements.[72]

Delaware's contractarian focus reflects the dualistic nature of its limited partnerships.  "A limited partnership is a creature of both statute *and* contract."[73]  By

---

[67] *DeLucca v. KKAT Mgmt., L.L.C.*, 2006 WL 224058, at *2 (Del. Ch. Jan. 23, 2006).

[68] *Glaxo Gp. Ltd. v. DRIT LP*, 248 A.3d 911, 919 (Del. 2021).

[69] *Chi. Bridge & Iron Co. v. Westinghouse Elec. Co.*, 166 A.3d 912, 926–27 (Del. 2017); *accord OptiNose AS v. Currax Pharms., LLC*, 264 A.3d 629, 638 (Del. 2021).

[70] *In re Marriott Hotel Props. II L.P. U'holders Litig.*, 1996 WL 342040, at *5 (Del. Ch. June 12, 1996) (Allen, C.) (internal quotation marks omitted).

[71] *Sonet v. Timber Co., L.P.*, 722 A.3d 319, 323 (Del. Ch. 1998) (Chandler, C.).

[72] *JER Hudson GP XXI LLC v. DLE Invs., L.P.*, 275 A.3d 755, 782 (Del. Ch. 2022) (internal quotation marks omitted).

[73] *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 1456494, at *5 (Del. Ch. Nov. 5, 2001) (Steele, J., sitting by designation) (emphasis added).

statute, limited partnerships promote "freedom of contract."[74] To discharge contractual freedom, Delaware courts strictly "regard[] and enforce[]" limited partnership agreements.[75] "Our strict approach to contract interpretation and enforcement puts [parties] on notice regarding the primacy of [limited] partnership agreements . . . ."[76] A court "will not [be] tempted by the piteous pleas of limited partners who are seeking to escape the consequences of their own decisions to [join] in a [limited] partnership[.]"[77] Even less when the limited partners are sophisticated entities that bilaterally negotiated the very agreement they now seek to avoid.[78]

Against this background, I turn to the LPA.

1. **Exit Offered No Evidence That The General Partner Took Any Of The Challenged Deductions In Subjective Bad Faith.**

Exit starts with the Challenged Deductions. But this approach ignores who took them: the General Partner. Under the LPA, the General Partner cannot be liable for breach of contract unless it acts in subjective bad faith. Exit failed to prove that.

---

[74] 6 *Del. C.* § 17-1101(c).

[75] *JER Hudson*, 275 A.3d at 782.

[76] *Boardwalk Pipeline P'rs, LP v. Bandera Master Fund LP*, 288 A.3d 1083, 1108 (Del. 2022) (internal quotation marks omitted).

[77] *Miller v. Am. Real Est. P'rs, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001) (Strine, V.C.).

[78] *See, e.g., New Enter. Assocs. 14, L.P. v. Rich*, --- A.3d ----, 2023 WL 3195927, at *33 (Del. Ch. May 2, 2023) ("'Sophisticated parties' can and should 'make their own judgments about the risk they should bear,' and Delaware courts are 'especially chary about relieving sophisticated entities of the burden of freely negotiated contracts.'" (quoting *ABRY P'rs V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032, 1061–62 (Del. Ch. 2006))).

18

A general partner owes fiduciary duties to the partnership and its limited partners[79] and is liable for breaching the partnership agreement.[80]  But these default rules are not immutable.  The Delaware Revised Uniform Limited Partnership Act (the "DRULPA") "allows a partnership to eliminate 'any and all liabilities for breach of contract and breach of duties (including fiduciary duties) of a partner or other person to a limited partnership or to another partner or to another person that is a party to or is otherwise bound by a partnership agreement[.]'"[81]

The DRULPA also permits the partnership to "replace [fiduciary duties] with contractual duties."[82]  In that setting, "investors [cannot] hold the general partner to fiduciary standards of conduct, but instead must rely on the express language of the partnership agreement to sort out the rights and obligations among the general partner, the partnership, and the limited partner investors."[83]  The appropriate contractual standard varies with the partnership agreement's "precise language."[84]

---

[79] *See, e.g.*, *JER Hudson*, 275 A.3d at 783–84.

[80] *See, e.g.*, *Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 172 (Del. 2002).

[81] *Boardwalk*, 288 A.3d at 1108 (quoting 6 *Del. C.* § 17-1101(f)).

[82] *Brinckerhoff v. Enbridge Energy Co.*, 159 A.3d 242, 252 (Del. 2017) (citing 6 *Del. C.* § 17-1101(d)).

[83] *Dieckman v. Regency GP LP*, 155 A.3d 358, 366 (Del. 2017).

[84] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013).  *See DV Realty Advisors LLC v. Policemen's Annuity & Benefit Fund*, 75 A.3d 101, 110 (Del. 2013) (The court discerns a contractual standard of conduct by focusing on the agreement's "overall

One word can make all the difference.[85]

Word choice often matters most when drafters choose a good faith standard. When a partnership agreement replaces fiduciary duties with a contractual duty to act with a "good faith belief" that the challenged action is in the partnership's best interests, the standard governing breach is "subjective bad faith."[86] Subjective bad faith is "conduct motivated by an actual intent to do harm."[87] As a result, a claimant cannot prove a breach under a subjective bad faith standard unless it introduces evidence sufficient to support a finding that the actor "consciously disregarded" its duties or did not subjectively believe its action was in the partnership's best interests.[88] "Quibbles" with a managerial decision "are not sufficient" to satisfy this

_____

scheme" and the "larger provision—or value—[the duty] sought to protect." (internal quotation marks omitted)).

[85] *Compare Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 361–62 & n.34 (Del. 2013) (inclusion of the word "reasonably" to qualify the general partner's "beliefs" regarding the partnership's "best interest" heightened an otherwise "purely subjective" standard of good faith to an objective standard of good faith), *with Allen*, 72 A.3d at 104–06 (absence of the word "reasonably" had the opposite effect), *and DV Realty*, 75 A.3d at 109–10 (same).

[86] *See, e.g.*, *DV Realty*, 75 A.3d at 109–10; *accord ev3, Inc. v. Lesh*, 114 A.3d 527, 539–40 (Del. 2014); *Fox v. CDX Hldgs.*, 2015 WL 4571398, at *25 (Del. Ch. July 28, 2015) ("When a contract governed by Delaware law calls upon a party to act or make a determination in good faith, without any qualifier, it means that the party must act in subjective good faith."), *aff'd*, 141 A.3d 1037 (Del. 2016).

[87] *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 64 (Del. 2006).

[88] *Allen*, 72 A.3d at 106. The scope of the subjective bad faith standard differs from the scope of an objective standard, which applies when the agreement requires the actor to act with a "reasonable belief" that its actions are in the Partnership's best interests. *See id.* at 101–02, 104, 106–07; *Norton*, 67 A.3d at 361–62 & n.34.

standard.[89]  Instead, "an extraordinary set of facts" generally is required.[90]

The LPA adopted a subjective bad faith standard.  The LPA eliminates the General Partner's default fiduciary duties to the Special Limited Partner.[91]  The LPA then replaces those duties with a contractual duty to act "in good faith on behalf of the Partnership" when "performing" a function "reasonably believed[92] to be within the scope of authority conferred" on the General Partner.[93]  The Delaware Supreme

---

[89] *Morris v. Spectra Energy P'rs (DE) GP, LP*, 2017 WL 2774559, at *14 (Del. Ch. June 27, 2017).  *See, e.g.*, *Allen*, 72 A.3d at 104–06 (allegations that a conflicts committee may have negotiated poorly did not suggest subjective bad faith); *Brinckerhoff v. Enbridge Energy Co.*, 2011 WL 4599654, at *10 (Del. Ch. Sept. 30, 2011) (dismissing claim that conflicts committee acted in subjective bad faith where committee relied on independent advisors), *aff'd*, 67 A.3d 369 (Del. 2013); *In re Atlas Energy Res., LLC U'holder Litig.*, 2010 WL 4273122, at *14 (Del. Ch. Oct. 28, 2010) (dismissing claim based on allegation that management "failed to even look at all of its options or to negotiate the best deal available" because such failures did "not suggest . . . subjective bad faith"); *Foley v. GlidePath Power Sols., LLC*, C.A. No. 2021-0891, at 19–20 (Del. Ch. May 30, 2023) (TRANSCRIPT) (dismissing claim for failure to well-plead subjective bad faith where plaintiff alleged that management's determination of a company's fair market value was "mathematically wrong" based on plaintiff's competing arithmetic).

[90] *Allen*, 72 A.3d at 106.

[91] LPA § 10.

[92] *Id.* § 18(a).  In contrast to "reasonable best interests" language in cases imposing an objective standard of conduct, the reasonableness language in the LPA is attached to the General Partner's beliefs about the scope of its authority, rather than its beliefs about what is in the interests for the Partnership.  *Cf. Norton*, 67 A.3d at 361–62 & n.34.

[93] *Id.* § 18(a).  *See Allen v. El Paso Pipeline GP Co.*, 113 A.3d 167, 179 (Del. Ch. 2014) ("The contractual standard of 'best interests of the Partnership' departs from the fiduciary standard of conduct that applies in the corporate arena and which would apply by default absent the contractual modification or elimination of fiduciary duties in an alternative entity agreement."), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (TABLE).

Court has interpreted this precise language to embody the elements constituting the subjective bad faith standard.[94]

Here, Exit has offered no evidence—let alone extraordinary evidence—suggesting the General Partner took the Challenged Deductions in subjective bad faith. To the contrary, Exit's "bad faith" evidence attempts to target Schurgin personally, not the General Partner's process for taking the Challenged Deductions.[95] In contrast, Defendants have offered considerable evidence supporting a finding that the General Partner took the Challenged Deductions based on standard accounting principles, the Partnership's books and records and outstanding obligations, and its prior experience in distributing proceeds to Festival investors. Nothing in the record suggests the General Partner took the Challenged Deductions believing they were not in the *Partnership's* best interests. So it does not matter that they had the effect of precluding *Exit's* distribution.[96]

---

[94] *See Gatz Props., LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1216–17 (Del. 2012) (construing this language to require proof of a "conscious disregard" of the relevant duty). Although the *Gatz* decision involved a limited liability company, it interpreted the exact same exculpatory provision adopted under the LPA. Moreover, LLC parties, like limited partnership parties, may eliminate fiduciary duties and replace them with contractual duties. *See* 6 *Del. C.* § 18-1101(e).

[95] *See* Dkt. 134 at 58–59. Exit also alleged Defendants manufactured the Negative Accruals Deduction in response to litigation. As support, Exit cited to an isolated page of the trial transcript. *Id.* at 59. The page contains testimony that the General Partner updated its books after realizing it missed the Negative Accruals Deduction. Tr. at 444:4–7. In any event, as discussed below, the Negative Accruals Deduction is not essential to my analysis.

[96] *See, e.g.*, *In re Kinder Morgan Corp. Reorganization Litig.*, 2015 WL 4975270, at *8 (Del. Ch. Aug. 20, 2015) (dismissing claims under comparable provision because, among

Given Exit's failure of proof—and the LPA's broadly enabling provisions animating the General Partner's discretion to take deductions and exclusive authority to manage the Partnership[97]—I likely could stop my analysis here.[98] For completeness, however, I will examine the individual deductions.

### 2. The Defeasance Deduction Was Proper Under Any Analysis.

The General Partner cannot be liable for breaching the LPA unless it acts in subjective bad faith. But even if a lower standard applied, Exit would fare no better.

---

other things, "the Committee did not have to believe that the MLP Merger was in the best interests of the *limited partners*. [It] rather had to believe in good faith that the MLP Merger was in the best interests of the *Partnership*." (emphases added)), *aff'd sub nom. Haynes Fam. Tr. v. Kinder Morgan G.P.*, 135 A.3d 76 (Del. 2016) (TABLE); *accord El Paso Pipeline*, 113 A.3d at 181; *see also In re CVR Ref., LP U'holder Litig.*, 2020 WL 5066680, at *10 (Del. Ch. Jan. 31, 2020) ("When considering whether [action] is in the 'best interests of the partnership,' the Court generally takes a holistic approach, considering the effects on the partnership as an entity." (quoting *Norton*, 67 A.3d at 367)).

[97] *See, e.g.*, LPA § 7(b) (enabling the General Partner to take all acts necessary and advisable "in its sole judgment" to discharge the Partnership's purposes); LPA § 14 (enabling the General Partner to allocate "deductions" in its "sole discretion"); LPA at A-5 (enabling the General Partner to "determine" "all" the Partnership's "expenses" or "indebtedness" in calculating "Resale Proceeds" distributable to the Special Limited Partner); LPA at A-5 (enabling the General Partner to "prorate" the Base Resale Distribution Amount and Resale Price Threshold in its "good faith discretion"); *see also Brinckerhoff*, 159 A.3d at 259 (undefined term good faith must be interpreted consistently throughout the LPA).

[98] *See, e.g.*, *Gelfman v. Weeden Invs., L.P.*, 792 A.2d 977, 984–87 (Del. Ch. 2001) (Strine, V.C.) (examining "sole discretion" provisions in a limited partnership agreement against an analogous exculpatory provision and concluding that conduct falling short of a breach of the general partner's contractual duties would be exculpated entirely); *Mehra v. Teller*, 2021 WL 300352, at *24 (Del. Ch. Jan. 29, 2021) (explaining that the purely subjective standard requires deference to the challenged decision if the decision-maker determined in good faith that the decision was in the partnership's best interests); *see also Kinder Morgan*, 2015 WL 4975270, at *8 (dismissing claims because, among other things, the plaintiff failed to identify a violation of the contractual duty).

23

Under its preferred framework, Exit sought to prove that the Challenged Deductions fit nowhere within Subsections (d), (f), or (h).[99]  I resolve that theory in two steps. First, I determine the applicable Resale Price Threshold.  Second, I measure the Net Resale Price against that threshold.  At this step, I also decide whether any or all the Challenged Deductions are proper.  Based on these determinations, Exit is not entitled to a distribution of a Special Limited Partner's Portion.

### a.    The 2014 Resale Price Threshold Applies.

The parties agree that the Ponte Gadea Sale was a Resale.[100]  The distribution of the Special Limited Partner's Portion depends on a Resale Price Threshold.  The applicable Resale Price Threshold, in turn, depends on a Resale Year.  The Resale Year is "the calendar year in which [the] Resale occurs."[101]  Here, the Ponte Gadea Sale closed on January 7, 2014.  The Resale Price Threshold for 2014 is $100 million.  So the applicable Resale Price Threshold is $100 million.  It is that simple.

To complicate things, Exit invokes the doctrine of "constructive receipt."[102] In Exit's view, the 2013 Resale Price Threshold of $90 million applies because Ponte Gadea *deposited* on the Property in 2013.  Exit thus treats a partial payment on a property as a full-blown acquisition of the property.  That equation does not add up.

---

[99] Focused on this express breach analysis, Exit does not argue an implied covenant theory.

[100] PTO ¶ 18.

[101] LPA at A-5.

[102] Dkt. 134 at 51–54.

For one, constructive receipt is a "technical [income] tax" doctrine.[103]  Exit cites no authority, and could not find any,[104] applying it outside the tax context.  More fundamentally, the Partnership's duty to pay income tax on Ponte Gadea's deposit has nothing to do with the Partnership's duty to close on the Ponte Gadea Sale.  The PGSA addresses that duty, not the Internal Revenue Code.

For another, Exit overlooks the Partnership's extension right.  The PGSA envisioned a closing on December 10, 2013.  But it also allowed the Partnership to extend closing by thirty days.[105]  The Partnership did so.  End of story.[106]

---

[103] *In re TransPerfect Glob., Inc.*, 2018 WL 904160, at *22 (Del. Ch. Feb. 15, 2018).  *See also Hampshire Gp., Ltd. v. Kuttner*, 2010 WL 2739995, at *26–29 (Del. Ch. July 12, 2010); *see generally* 26 C.F.R. § 1451-2; *Leavens v. Comm'r of Internal Revenue*, 467 F.2d 809, 813–14 (3d Cir. 1972).

[104] Oral Arg. Tr. at 85:16–23.

[105] PGSA § 18.

[106] Exit concedes that the Partnership had no duty to close in December.  *See* Oral Arg. Tr. at 83:1–3.  Despite this, Exit also has suggested that the Partnership extended closing to 2014 for the bad faith purpose of inflating the Resale Price Threshold.  Dkt. 134 at 54–56.  But the evidence did not back this up.  Credible testimony instead supports a finding that the Partnership deferred closing to complete a 1031 Exchange and thus prevent the Partnership from recognizing unwanted gains in the Ponte Gadea Sale.  Properly understood, then, Exit's theory amounts to little more than timing-based innuendo.  The preponderance of the evidence standard, however, requires a claimant to do more than waft smoke into the courtroom.  *See, e.g.*, *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015) ("Proof by a preponderance of the evidence . . . means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.  By implication, the preponderance of the evidence standard also means that if the evidence is in equipoise, [the party carrying the burden] lose[s]." (internal quotation marks and citations omitted)).  Based on the evidence presented at trial, Exit failed to prove that a 1031 Exchange, or its timing, was a ruse to undercut the Special Limited Partner's Portion.

25

The 2014 Resale Price Threshold is $100 million. And the 2014 Base Resale Distribution Amount is $3 million.[107] So Exit is not entitled to the Special Limited Partner's Portion unless the Net Resale Price of the Ponte Gadea Sale is greater than $97 million.[108] Determining the Net Resale Price first requires an understanding of how the Challenged Deductions interact with the $97 million floor.[109]

Net Resale Price is the purchase price minus eight types of costs, *e.g.*, those specified in Subsections (d), (f), and (h).[110] The purchase price was $108 million. The General Partner deducted $18,077,752 from that total, for a Net Resale Price of $89,922,248. The Challenged Deductions comprise $12,073,173 of the deductions.

Assuming all the Challenged Deductions were improper, the Net Resale Price would be $101,995,421. On that benchmark, the only Challenged Deduction that, if proper, would put the Net Resale Price below $97 million is the Defeasance Deduction.[111] If proper, that deduction would result in a Net Resale Price of

---

[107] LPA at Schedule D & note.

[108] *See id.* (explaining that Base Resale Distribution Amount must be reduced dollar for dollar by the amount at which the applicable Resale Price Threshold exceeds the Net Resale Price of a Resale); *accord* Oral Arg. Tr. at 135:2–8 (Pl.'s Couns.).

[109] Although I discuss the mathematics for clarity, Exit did not seek to quantify any of its damages, at trial or afterward. *See infra* note 163.

[110] LPA at A-3 to A-4.

[111] If the Preferred Return Deduction were the only proper deduction, it would result in a Net Resale Price of $100,728,889 and thus, a distribution of approximately $3,072,889. *See id.* at A-6, Schedule D. If Negative Accruals Deduction were the only proper deduction, it would result in a Net Resale Price of $97,438,935 and thus, a distribution of $438,935. *Id.*

$95,745,266, or a Base Resale Distribution Amount of $0.[112]  If the Defeasance Deduction is proper, Exit does not receive the Special Limited Partner's Portion.

Given these mathematical realities, I will assume for analytical purposes that the Negative Accruals and Preferred Return Deductions are improper and focus solely on the Defeasance Deduction.  The parties agree that the LPA is unambiguous.[113]  And under the LPA's plain language, the General Partner properly took the Defeasance Deduction.

### b. Defeasance Costs Are Deductible Under Subsections (d), (f), And (h).

"A limited partnership's purpose [provision] circumscribes" a general partner's authority, so I begin there.[114]  The Partnership's purpose is to take any action that is "related to or incidental to" the acquisition, ownership, and sale of the Property.[115]  The phrase "related to" is "paradigmatically broad."[116]  It captures anything that "touches on" the subject.[117]  The phrase "incidental to" is similarly vast.  It captures anything "having a minor role" in the subject.[118]  From the start,

---

[112] *See id.* at Schedule D & note.

[113] *See, e.g.*, Dkt. 134 at 33–35, 40–41; Dkt. 141 at 31–33.

[114] *JER Hudson*, 275 A.3d at 784.

[115] LPA § 7(a).

[116] *Fla. Chem. Co. v. Flotek Indus.*, 262 A.3d 1066, 1083 (Del. Ch. 2021) (internal quotation marks omitted).

[117] *See id.*; *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del. 2002).

[118] *Incidental*, Black's Law Dictionary (11th ed. 2019).

then, the LPA enables the Partnership to do just about anything "necessary, convenient, or advisable" for acquiring, owning, and selling the Property.[119]

The General Partner's authority is equally broad. The LPA permits the General Partner to do anything "incidental to," "in connection with," or "for the furtherance of" the Partnership's purposes.[120] The phrase "in connection with" is a phrase that "lawyers use when they wish to capture the broadest possible universe."[121] The phrase "for the furtherance of" achieves the same objective. It covers anything that "facilitat[es]" the subject or makes it "more likely to occur[.]"[122] The General Partner therefore may do just about anything, "in its sole judgment," to advance the Partnership's purpose of acquiring, owning, or selling the Property.[123]

Consistent with that wide latitude, the General Partner may bind the Partnership to contracts that touch on or facilitate the acquisition, ownership, or sale of the Property.[124] The LPA identifies the Loan Agreement as one of those contracts.[125] That is "significant," because when a "transaction is itself within the

---

[119] LPA § 7(a).

[120] *Id.* §§ 7(b), 8, 9(b).

[121] *DeLucca*, 2006 WL 224058, at *10 (Strine, V.C.).

[122] *Furtherance*, Black's Law Dictionary (11th ed. 2019).

[123] LPA § 7(b).

[124] *Id.*

[125] *Id.* §§ 7(b), 9(a); *id.* at A-1 to A-2.

28

[stated] purpose of the [P]artnership . . . the [G]eneral [P]artner may lawfully authorize and effectuate the transaction."[126] Exit does not argue otherwise. After all, Emanuel testified that Exit itself would have financed the call price using the CMBS Loan if it had the working capital to exercise the option.[127]

The LPA also contemplated a contract like the PGSA. The PGSA plainly is an "agreement or arrangement" that relates to, is incidental to, or furthers the sale of the Property.[128] The General Partner, then, "lawfully authorize[d]" it.[129] Exit does not dispute that either.

Both the Loan Agreement and the PGSA address defeasance. The Loan Agreement required the Partnership to defease the CMBS Loan at its own "expense[]" if the Partnership sold the Property before November 2016.[130] Similarly, the PGSA required the Partnership "to remove, by payment, bonding or otherwise any . . . mortgages that secure indebtedness against" the Property before closing the Ponte Gadea Sale.[131] By expressly incorporating the Loan Agreement,

---

[126] *JER Hudson*, 275 A.3d at 786–87 (alteration omitted) (quoting *Kan. RSA 15 L.P. v. SBMS RSA, Inc.*, 1995 WL 106514, at *2 (Del. Ch. Mar. 8, 1995) (Allen, C.)).

[127] Tr. at 172–73.

[128] LPA §§ 7(a)–(b), 9(a).

[129] *JER Hudson*, 275 A.3d at 787 (quoting *Kan. RSA*, 1995 WL 106514, at *2).

[130] Loan Agreement § 2.5.1.

[131] PGSA § 6(c).

the LPA incorporated defeasance.[132] By allowing the General Partner to secure the CMBS Loan and the PGSA's mortgage terms, the LPA plainly contemplated that the costs of defeasance would be related to, incidental to, imposed in connection with, or would further the Partnership's purpose of selling the Property.

The Special Limited Partner's Portion did too. The LPA defines the Special Limited Partner's Portion as a priority distribution of Resale Proceeds.[133] Resale Proceeds are "any proceeds received by the Partnership upon a Resale" minus deductions for the costs of paying for "all Partnership *expenses [or] indebtedness*" incurred in a Resale, "all as determined by the General Partner."[134] Defeasance plainly is a Partnership "expense" and cost of "indebtedness" incurred in connection with the Ponte Gadea Sale. The LPA thus permitted the General Partner to factor

---

[132] *See Town of Cheswold v. Cent. Del. Bus. Park*, 188 A.3d 810, 818–19 (Del. 2018) ("Other documents or agreements can be incorporated by reference where a contract . . . refers to another instrument and makes the conditions of such other instrument a part of it. When that occurs, the two will be interpreted together as the agreement of the parties." (cleaned up)). The Loan Agreement is not merely referenced; it is defined in the LPA, was executed contemporaneously with it, and regulates some of the LPA's terms. For instance, the Partnership cannot amend the LPA's definition schedule without Column Financial's approval. LPA § 9(c)(ii). Plus, Defendants have repeatedly relied on all three agreements, and Exit has never argued that they may not be considered together. *See Flotek*, 262 A.3d at 1081 (explaining that contemporaneous contracts are generally interpreted together).

[133] LPA § 15(b).

[134] *Id.* at A-5 (emphasis added).

defeasance into its deductions. After all, the General Partner always has "sole discretion" to allocate "income" and "deductions" within the Partnership.[135]

To calculate Resale Proceeds, the General Partner works through the definition of Net Resale Price. There, the General Partner may deduct Partnership expenses or indebtedness under "one or all" of the cost categories, including Subsections (d), (f), and (h). In this case, the Defeasance Deduction fits all three.

To begin, the Defeasance Deduction was proper under Subsection (d). Subsection (d) permits deductions for "costs or expenses associated with the ownership . . . of the Property reasonably borne by . . . the Partnership during the Partnership's ownership[.]"[136] "Ownership" means the "bundle of rights" that enable the owner to "use, manage, and enjoy" the asset, and to "convey" it to someone else.[137] Consistent with the expansive phrases defining the Partnership's purpose, the phrase "associated with" in this context means "related" or "connected" to ownership.[138]

Here, the LPA indisputably permitted the Partnership to acquire the Property with the CMBS Loan. Once secured, the CMBS Loan became related or connected to the Partnership's right to use, manage, and enjoy the Property. By the same token,

---

[135] *Id.* § 14.

[136] *Id.* at A-3.

[137] *Ownership*, Black's Law Dictionary (11th ed. 2019).

[138] *Associated*, Merriam-Webster (online ed.).

defeasing the CMBS Loan became related or connected to the Partnership's right to convey the Property to Ponte Gadea. Accordingly, defeasance costs are unambiguously costs of ownership.

The Defeasance Deduction was proper under Subsection (h) as well. Subsection (h) permits deductions for "[a]ll . . . out-of-pocket closing costs and costs of sale incurred *in connection with*" a Resale.[139] In the real estate context, a "closing" is "the final transaction between the buyer and seller, whereby the conveyancing documents are concluded and the money and property transferred."[140] Unsurprisingly, then, "closing costs" have been defined in the real estate context to mean "[t]he expenses that must be paid" to complete the sale.[141]

Here, the Partnership was required under the Loan Agreement to defease— and did defease—the CMBS Loan at its own expense because the Partnership sold the Property before November 2016. Those costs touch on the Ponte Gadea Sale. Ponte Gadea would not have accepted title to the Property if it had remained encumbered by the CMBS Loan post-close.[142] And Column Financial would not have released the CMBS Loan if it were not defeased pre-close. Accordingly, defeasance costs are unambiguously closing costs or costs of sale incurred in

---

[139] LPA at A-4 (emphasis added).

[140] *Closing*, Black's Law Dictionary (11th ed. 2019).

[141] *Closing Costs*, in *id.*

[142] PGSA § 6(c).

32

connection with the Ponte Gadea Sale.

Finally, the Defeasance Deduction is proper under Subsection (f). Subsection (f) permits deductions for "[a]ny excess costs associated with any loan on the Property . . . during the Partnership's ownership."[143] These Excess Loan Costs include costs that are "similar" to, among other things, "loan interest costs[.]"[144] As discussed, defeasance costs are "similar" to loan interest costs, because defeasance economically replicates the cost of interest due on a loan.[145] Defeasance costs "exceeded" the interest costs on the CMBS Loan because the Partnership defeased the CMBS Loan at a premium to its previous interest payments.[146] And because Rental Payments never exceeded Subsection (f)'s $875,000 threshold, the General Partner properly determined that the tenant's rent was insufficient to cover defeasance costs.[147] Accordingly, defeasance costs plainly are Excess Loan Costs.

One or all, the upshot is the same. The LPA plainly permitted the Defeasance Deduction. To contend otherwise, Exit advances four arguments. None succeeds.

---

[143] LPA at A-3.

[144] *Id.*

[145] *See, e.g.*, *Similar*, Merriam-Webster (online ed.) ("having characteristics in common; alike in substance or essentials").

[146] *See, e.g.*, JX 86 (Defeasance Report); *Excess*, Black's Law Dictionary (11th ed. 2019) ("The amount or degree by which something is greater than another"); *Excess*, Merriam-Webster (online ed.) ("more than the usual [or] specified amount").

[147] LPA at A-3 to A-4.

Exit first argues that the Defeasance Deduction is improper as a matter of plain language because the LPA does not specifically use the word "defeasance."[148] Plain meaning rules require courts to enforce a contract's words as written. But they do not require contract drafters to use every word in the English language. The LPA is broad enough to capture defeasance. So it did not need to say it too.[149]

Exit next contends that, even if the Defeasance Deduction is proper, its size is not. According to Exit, defeasance costs must be prorated to reflect the specific date in the Resale Year—here, January 7, 2014—on which the Ponte Gadea Sale occurred. But Exit misreads the LPA. In defining Resale, the LPA requires the General Partner to prorate costs by the "*proportion that the portion of the Property sold under the Resale bears to the Property*."[150] The LPA thus ties proration to how much of the Property is sold, not when it is sold. Here, the Partnership sold the entire

---

[148] *See, e.g.*, Dkt. 134 at 33–35.

[149] Exit cites no authority for the proposition that a contract does not capture a term unless that term is named explicitly. Nor could it. It is not "cognitively possible" for contract drafters to cover every base. *Credit Lyonnais Bank Nederland v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.). That is one reason why, as Defendants point out, drafters use constructions like "including, but not limited to," as the LPA drafters did here. *See* LPA at A-6 § B. Exit responds with expert testimony suggesting that the parties would have used the word "defeasance" if they intended to factor defeasance costs into the deductions. That extrinsic evidence is not admissible here, because the LPA is unambiguous. Regardless, as explained, the LPA incorporated defeasance by incorporating the Loan Agreement. So the parties did address defeasance.

[150] *Id.* at A-5 (emphasis added).

Property.   So the General Partner properly determined, "in its good faith discretion,"[151] that all the defeasance costs were deductible.[152]

Unable to pierce Subsections (d) or (h), Exit tries to joust at Subsection (f). Exit says the Defeasance Deduction fits only under Subsection (f) because it is more "specific" than the other two.[153]  It is true that specific language controls general language.  But that canon applies only if the general "conflicts" with the specific.[154] And no conflict exists here.  Each Subsection specifies a different cost category and the Defeasance Deduction fits into at least three.[155]  Plus, the LPA permits the

---

[151] *Id.* As discussed, the General Partner based the Defeasance Deduction on standard accounting principles, the Partnership's books and records, and Festival's ordinary distribution procedures.  The process was mechanical and the General Partner's accountant credibly testified that only these objective facts were considered in the analysis. *See Allen*, 72 A.3d at 106–07 (credible reliance on objective facts constitutes competent evidence that the decision-maker acted consistently with a contractual duty of subjective good faith).

[152] Exit also suggests that, if defeasance is a "closing cost," it is an impermissibly large closing cost subject to proration.  But as Defendants persuasively argue, Subsection (h) contemplated large expenses, because it also expressly covers costs like attorney's fees. *Id.* at A-4.  Yet, on Exit's theory, a January real estate attorney's fee must be prorated, whereas (presumably) a December real estate attorney's fee does not.

[153] Dkt. 134 at 38.

[154] *DCV Hldgs. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

[155] *See, e.g.*, *ITG Brands, LLC v. Reynolds Am., Inc.*, 2022 WL 4678868, at *17 (Del. Ch. Sept. 30, 2022) (no conflict where the two provisions "address[ed] different situations[,]" and explaining that "the fact that one subsection of § 2.01(c) *does not* make something an Assumed Liability does not mean that it *cannot* be an Assumed Liability under another subsection. Even agreements tailored to particular transactions include overlapping or redundant or meaningless provisions." (emphases in original) (cleaned up)); *Pilot Air Freight v. Manna Freight Sys.*, 2020 WL 5588671, at *13 (Del. Ch. Sept. 18, 2020) (no conflict where one provision addressed a specific "subset" of indemnification obligations addressed in a "more general" provision governing indemnification obligations); *Ivize of*

35

General Partner to take deductions under "one *or all*" of the Subsections.[156]  So, "specific" or not, the General Partner was not limited to Subsection (f) anyway.

Having found no support in the LPA, Exit last seeks to redraft it.  Exit glosses Subsection (f) using Emanuel's "invented" terms and his personal view that, in his mind, the LPA was not meant to cover defeasance costs.  But Emanuel's subjective intent is irrelevant.  Delaware follows the objective theory of contracts, a framework familiar to Emanuel.[157]  "Under the objective theory, 'intent' does not invite a tour through the plaintiff's cranium, with the plaintiff as the guide."[158]  Instead, the Court determines intent by looking to "the four corners of the agreement[.]"[159]  And where, as here, the agreement is unambiguous, "extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."[160]  So I will not consider Emanuel's "philosophies" behind the LPA.[161]

---

*Milwaukee, LLC v. Compex Litig. Support, LLC*, 2009 WL 1111179, at *9–10 (Del. Ch. Apr. 29, 2007) (no conflict where "neither section" was "structured to govern the other").

[156] LPA at A-3.

[157] Defendants introduced at trial a chapter from *Emanuel CrunchTime*.  *See* Ex. C. to Dkt. 141 at 6 ("The doctrine that only the parties' acts, and not their subjective thoughts, are relevant in determining [intent], stems from the **objective theory of contracts** . . . . Because neither contracting parties nor courts are mind-readers . . . a party's intentions are to be gauged **objectively**, rather than subjectively."  (emphases in original)).

[158] *Progressive Int'l Corp. v. E.I. du Pont de Nemours & Co.*, 2002 WL 1558382, at *7 (Del. Ch. July 9, 2002) (Strine, V.C.) (cleaned up).

[159] *Salamone*, 106 A.3d at 368 (internal quotation marks omitted).

[160] *Eagle Indus.*, 702 A.2d at 1232.

[161] Dkt. 134 at 13.  As observed earlier, Emanuel's conception of the LPA is based on terms he "invented" and that he did not explain to Exit's deal counsel.  As a result, Exit's deal

In the end, Exit turned a quick $8 million profit on an option it lacked the capital to exercise. It also obtained a contingent—not guaranteed—right to a future distribution. As the definition of Net Resale Price makes clear, any distribution would have resulted from the Partnership's costs in raising the Property's value. Based on the LPA's plain terms and management structure, it would be commercially unreasonable to conclude that the parties agreed at the time of contracting that Exit would receive a distribution *before* deductions for the Partnership's costs when those costs would make Exit's distribution possible in the first place. Contract "interpretations that are commercially unreasonable . . . must be rejected."[162] For that reason, and all the others explained, judgment is entered in favor of Defendants as to Exit's breach of contract claims.[163]

---

counsel could not communicate them to Festival's deal counsel. Accordingly, even if the LPA were ambiguous, Emanuel's extrinsic evidence would not be a viable source for determining the parties' intent at the time of contracting. *See, e.g.*, *SI Mgmt. L.P. v. Wininger*, 707 A.2d 37, 43 (Del. 1998) ("A court considering extrinsic evidence assumes that there is some connection between the expectations of contracting parties revealed by that evidence and the way contract terms were articulated by those parties. Therefore, unless extrinsic evidence can speak to the intent of *all* parties to a contract, it provides an incomplete guide with which to interpret contractual language." (emphasis in original)); Oral Arg. Tr. at 138:20–22 (Pl.'s Couns.) (conceding, with admirable candor, that relying on Emanuel's interpretation of the LPA would "not be consistent with Delaware law").

[162] *Manti Hldgs. v. Authentix Acq. Co.*, 261 A.3d 1199, 1211 (Del. 2021).

[163] Although I need not reach damages, I note that Exit has never sought to quantify them. As discussed, the LPA has a formula for deriving the Special Limited Partner's portion. Exit did not mention that formula until post-trial argument. *See* Oral Arg. Tr. at 89:1–6, 134:20–135:9. In litigation for money damages, it is hard to understand why a plaintiff would decline to quantify damages and instead leave this task to the court. *See, e.g.*, *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 613 (Del. Ch. 2010) (The Court "may not set damages . .

## B. Exit Failed To Prove Its Claim Against Schurgin.

Finally, I consider Exit's claim against Schurgin. This one is confusing.

Exit first concedes that the LPA eliminates the General Partner's default fiduciary duties.[164] It then observes that a partnership cannot disclaim the implied covenant.[165] Without further elaboration, Exit next posits that Schurgin can be liable for "willful misconduct."[166] Based on this logical chain, Exit ultimately concludes that Schurgin "can be jointly and severally liable with the [G]eneral [P]artner for aiding and abetting the [G]eneral [P]artner's breach of fiduciary duties."[167]

Given this hodgepodge of concepts, it is not clear which analytical framework is appropriate here. But it is clear that Schurgin is not personally liable for anything.

---

. where a plaintiff fails to adequately prove" them.), *aff'd sub nom. ASDI Rsch., Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010); *eCommerce Indus. v. MWA Intel., Inc.*, 2013 WL 5621678, at *19 (Del. Ch. Sept. 30, 2013) (damages are a necessary element of a breach of contract claim and require proof by a preponderance of the evidence); *VH5 Cap., LLC v. Rabe*, 2023 WL 4305827, at *21–23 (Del. Ch. June 30, 2023) (awarding nominal damages where the plaintiff failed to prove damages and collecting authority); *Smart Sand, Inc. v. US Well Servs. LLC*, 2021 WL 2400780, at *13–14 (Del. Super. June 1, 2021) (Wallace, J.) (finding a plaintiff failed to prove damages where plaintiff did not provide a "comprehensible explanation" for its damages calculation and introduced "scant testimony" on damages); *see also Balooshi v. GVP Glob. Corp.*, 2022 WL 576819, at *13 (Del. Super. Feb. 25, 2022) (rejecting defenses based on recoupment and setoff because both theories "require some proof of loss" but defendant failed to offer any "evidence of a quantifiable injury"), *aff'd*, 285 A.3d 839 (Del. 2022) (TABLE).

[164] Dkt. 134 at 56.

[165] *Id.* at 56–57.

[166] *Id.* at 57. Exit appears to premise its argument on inclusion of Schurgin within the exculpatory provision's definition of "Covered Persons." *See* LPA § 18(a).

[167] Dkt. 134 at 57.

Most obviously, the General Partner does not owe fiduciary duties to Exit. Schurgin cannot "knowingly participate[]" in a breach of a duty that does not exist.[168] That should be the end of this.

To the extent Exit's "bad faith" claim is an implied covenant claim, I note that Exit's amended complaint referenced the covenant once, in passing, and without alleging how anyone breached it.[169] Even if fairly raised, though, the claim would fail as an attempt to rewrite the LPA.

The implied covenant is a gap-filling device that addresses unanticipated developments by inferring terms in an agreement's express language to which the parties would have agreed at the time of contracting had they considered them. "Existing contract terms control, however, such that implied good faith cannot be used to circumvent the parties' bargain, or to create a free-floating duty unattached to the underlying legal document."[170] As a result, limited partners that contractually

---

[168] *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001) (internal quotation marks omitted). Exit does not argue that Schurgin breached his default fiduciary duties as the General Partner's controller. That theory was potentially available under *In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991). I say "potentially" because Exit has not addressed whether the LPA's fiduciary duty disclaimer is broad enough to capture Schurgin. *See Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020) (observing that the DRULPA enables partnerships to contract around *USACafes*).

[169] Dkt. 12 ¶ 82. As noted earlier, Exit does not argue, or devote any of its briefing to analyzing the contractual question of whether, the *General Partner* breached the implied covenant. As a result, Defendants have argued that Exit's passing reference to the covenant is insufficient to provide notice of, let alone prove, an implied covenant claim.

[170] *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005) (cleaned up).

agree to eliminate fiduciary duties cannot "re-introduce fiduciary review through the

backdoor of the implied covenant[.]"[171] As Vice Chancellor Laster has explained:

> When an LP agreement eliminates fiduciary duties as part of a detailed contractual governance scheme, Delaware courts should be all the more hesitant to resort to the implied covenant . . . .
>
> When parties exercise the authority provided by [the DRULPA] to eliminate fiduciary duties, they take away the most powerful of a court's remedial and gap-filling powers . . . . After all, if the parties wanted courts to be in the business of shifting losses after the fact, then they would not have eliminated the most powerful tool for doing so.
>
> Respecting the elimination of fiduciary duties requires that courts not bend an alternative and less powerful tool into a fiduciary substitute. The nature of the implied covenant of good faith and fair dealing is "quite different from the congeries of duties that are assumed by a fiduciary" . . . . To use the implied covenant to replicate fiduciary review "would vitiate the limited reach of the concept of the implied duty of good faith and fair dealing."[172]

Exit cannot use the implied covenant to resurrect the fiduciary duties it interred.[173]

---

[171] *Lonergan v. EPE Hldgs.*, 5 A.3d 1008, 1019 (Del. Ch. 2010).

[172] *Id.* at 1017–19 (first quoting *Katz v. Oak Indus.*, 508 A.2d 873, 879 n.7 (Del. Ch. 1986) (Allen, C.); and then quoting *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del. 2010)).

[173] *See, e.g.*, *Nationwide Emerging Managers, LLC v. Northpointe Hldgs.*, 112 A.3d 878, 897 (Del. 2015) ("An interpreting court cannot use an implied covenant to re-write the agreement between the parties, and should be most chary about implying a contractual protection when contract could easily have been drafted to expressly provide for it." (internal quotation marks and citations omitted)); *Buck v. Viking Hldg. Mgmt. Co.*, 2021 WL 673459, at *5 (Del. Super. Feb. 22, 2021) (LeGrow, J.) ("A contracting party may not use the implied covenant to vary a contract's express terms . . . . As a result, where the express terms of an agreement govern a particular matter, an implied covenant claim regarding that matter is not viable . . . ." (citations omitted)); *see also Brinckerhoff*, 159 A.3d at 252–53 ("If fiduciary duties have been validly disclaimed, the limited partners cannot rely on [them] to regulate the general partner's conduct. Instead, they must look exclusively to the LPA's complex provisions to understand their rights and remedies.").

Moreover, Exit impermissibly conflates the LPA's express good faith standard with the implied covenant. A limited partner who agrees to replace fiduciary duties with an express contractual duty of good faith cannot invoke the implied covenant's good faith "concept" to rewrite that contractual duty.[174] As former Chief Justice Strine has explained:

> [W]hen a trial court is addressing an express contractual provision requiring the exercise of good faith, it must focus the breach inquiry on whether the party bound by the provision had acted in subjective bad faith based on the circumstances existing at the time of its alleged breach, within the context defined by the terms of the parties' contractual bargain. Accordingly, when a contract's express terms incorporate a good faith requirement, the trial court should focus on the meaning of that express contractual duty . . . .

> [A] trial court must avoid conflating the standard for breach of an express contractual duty to exercise good faith with the implied covenant of good faith and fair dealing, which acts as a check on the behavior of contracting parties and must be used cautiously.[175]

Consistent with this distinction, "[a] party does not act in bad faith by relying on

---

[174] *See, e.g.*, *DV Realty*, 75 A.3d at 108–10; *accord ev3*, 114 A.3d at 539–40. Contrary to Exit's suggestion, *see* Oral Arg. Tr. at 145–47 (suggesting that Exit's implied covenant theory involves an element of "scienter"), the implied covenant "does not depend on [a] mental state[,]" *see ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 440–45 (Del. Ch. 2012), *aff'd in part, rev'd in part on other grounds*, 68 A.3d 655 (Del. 2013); *see also NAMA Hldgs. v. Related WMC LLC*, 2014 WL 6436647, at *14 (Del. Ch. Nov. 17, 2014) ("[T]he implied covenant does not require that a party act in subjective bad faith[.]"); Martin I. Lubaroff & Paul M. Altman, *Delaware Limited Partnerships* § 14.03[B] at 14-62 to 14-64 (2d ed. 2022) (further distinguishing contractual duties of good faith, which focus on the time of breach, from the implied covenant, which focuses retrospectively on the time of contracting).

[175] *ev3*, 114 A.3d at 539 (citation omitted).

41

contract provisions for which that party bargained where doing so simply limits advantages to another party."[176]  Exit fails to recognize these differences.[177]

Boiled to its core, Exit's theory reduces to a complaint about the Special Limited Partner's narrow role in the Partnership's governance structure.  But the implied covenant is not "an equitable remedy for rebalancing economic interests after events that could have been anticipated, but were not, that later adversely affected one party to a contract."[178]  Exit agreed that the General Partner could manage the Partnership free from fiduciary obligations to the Special Limited Partner.  Exit cannot now use the covenant to reclaim the obligations it released.[179]

---

[176] *Nemec*, 991 A.2d at 1128.  *See Gerber v. Enter. Prods. Hldgs.*, 67 A.3d 400, 419 (Del. 2013) (The implied covenant's concept of "'good faith' does not envision loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract . . . . Express contractual provisions always supersede the implied covenant . . . ." (emphasis omitted) (quoting *ASB Allegiance*, 50 A.3d at 440–41)), *overruled in part on other grounds by Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 815 n.13 (Del. 2013); *El Paso Pipeline*, 113 A.3d at 182–83 ("Despite the appearance in its name of the terms 'good faith' and 'fair dealing,' the covenant does not establish a free-floating requirement that a party act in some morally commendable sense."); *see also Boardwalk*, 288 A.3d at 1099 (explaining that, in the absence of fiduciary duties, a general partner can take action "to the disadvantage" of a limited partner).

[177] Indeed, Exit appears to believe that the LPA's exculpatory provision is simply contractual confirmation that the parties maintained the implied covenant.  Dkt. 142 at 30.

[178] *Oxbow Carbon & Min. Hldgs. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotation marks omitted).

[179] *See Nationwide*, 112 A.3d at 881 ("Delaware law . . . prevents a party who has after-the-fact regrets from using the implied covenant of good faith and fair dealing to obtain in court what it could not get at the bargaining table."); *see also Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 350 (Del. 2020) ("Implying terms that the parties did not expressly include risks upsetting the economic balance of rights and obligations that the contracting parties bargained for in their agreement."); Paul M. Altman & Srinivas M. Raju, *Delaware*

At bottom, Exit had to show in light of the LPA's broadly enabling terms a breach of the contractual duty of good faith. Exit's generalized assertions of bad faith do not shoulder that burden. And under any analysis, the General Partner properly took the Defeasance Deduction. Schurgin, then, cannot be liable, as an accomplice or otherwise, for a breach that the General Partner did not commit. Judgment is therefore entered in Defendants' favor as to Exit's "bad faith" claim.

### III. CONCLUSION

For the foregoing reasons, I find in favor of Defendants on all counts. The parties shall submit a form of order implementing this decision as a final judgment.

---

*Alternative Entities and the Implied Covenant of Good Faith and Fair Dealing under Delaware Law*, 60 Bus. Law. 1469, 1484 (2005) ("The inclusion of [] sole discretion language in an LP [] agreement, in addition to eliminating any fiduciary duties that a person would otherwise have when exercising discretion, should have a significant impact on analyzing any claim that the general partner . . . violated the implied covenant . . . . [G]iven that the purpose of the implied covenant is to enforce the reasonable expectations of the parties to a contract, the inclusion of [] sole discretion language should have a significant bearing on the reasonable expectations of the parties." (defined terms omitted)).